Filed 12/20/24  P. v. Macias CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B330121 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA508653) |
| v. | |
| CHRISTIAN MACIAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Bork, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Christian Macias of human trafficking of a minor (Veronica A.) for a commercial sex act.  On appeal, defendant challenges the sufficiency of the evidence of his conviction.  He also asserts his trial counsel provided prejudicial ineffective assistance.  We affirm the judgment.

# STATEMENT OF FACTS

Veronica was born in September 2004.  In May 2022, she was 17 years old and living in Lancaster with her mother.  She was attending high school.

In June or July 2022, Veronica's friend, Roxanne, asked her to meet defendant.  Veronica did not know his real name but knew him as "Shoota."  Roxanne told Veroncia that defendant was a friend who took care of her.  It was only later that Veroncia learned Roxanne worked for defendant as a sex worker.  At this initial meeting, defendant interviewed Veronica for sex work on "the Blade."  The Blade was a street in Compton where sex workers congregated.

After the meeting, defendant drove Veronica and Roxanne to the Blade. Defendant directed Veronica on how much to charge customers for her services.  For example, she was told to charge $120 for a car date, which meant engaging in sexual acts in the customer's car.  Veronica was required to pay defendant a $3,000 "chooser fee" in order to work for him, but she could keep anything she earned over that amount.  Alternatively, the fee would be waived if she decided defendant could "take care of [her]."  She opted for the latter, and in exchange, he bought her clothes, food, and "basic stuff."  Veronica was required to call defendant "Daddy."

2

After the discussion of payment, Veronica got out of the car at the Blade and copied what the other girls[1] were doing. She worked for five hours and had six to eight customers. As she secured each customer, Veronica texted defendant that she was on a "date" and told him the price she was charging. After she was done with each customer, Veronica gave the money she earned to defendant, and he drove her back to the Blade to find the next customer.

Thereafter, defendant picked up Veronica every weekend and brought her to the Blade. After her shift ended, defendant drove Veronica back home. Veronica stayed in defendant's motel room while she was working. Roxanne and another sex worker nicknamed Stunna, who also worked for defendant, stayed in his room as well. Veronica referred to Roxanne and Stunner as "wifeys," which meant they worked for the same "pimp." A pimp is someone that uses girls to perform sex work for the pimp's financial benefit. Veronica continued to give all the money she earned to defendant. Defendant bought Veronica items for her sex work, including clothing, bags, marijuana, and ecstasy. Veronica later testified she would not have been a sex worker without a pimp.

Veronica testified she walked the Blade with Stunna. Sometimes they did double dates, which meant performing sexual acts on the same customer. This would earn them higher fees. Defendant explained to Veronica how to navigate the Blade and taught her the way to flirt and speak with potential customers. Defendant called Veronica "Lil' Steppa," which meant someone

---

[1] At trial, the sex workers are referred to as "girls," not women. Although some sex workers appear to be adults, we note it is unclear whether others were underage. We maintain the usage of "girls" throughout the opinion for ease of reference; no lack of respect is intended.

who constantly gets dates and brings in lots of money. Defendant gave Veronica the nickname "Royalty" to use with her customers. Defendant advised Veronica not to tell her customers she was a minor.

When Veronica worked the Blade, defendant was always nearby and provided her protection. Defendant usually rented a motel room for the girls to stay in and rented a different room for their dates. Veronica drank alcohol, smoked marijuana, and took ecstasy when getting ready for her customers. During her working hours, defendant did not let Veronica eat. If she had to use the restroom, defendant took her to an alley to relieve herself.

In early August 2022, Veronica met Avila, who was defendant's friend. After they met, defendant drove Avila and Veronica to the Blade. Veronica did sex work while defendant and Avila stayed together in the car. At some later date, defendant told Veronica that Avila had decided to be "one of his girls." Veronica started working with Avila in the following weeks. Veronica continued to give defendant the money she earned as a sex worker. However, she became increasingly fearful of defendant. On several occasions, defendant hit his girls if he felt they were acting "out of pocket," which meant acting disrespectfully. For example, a girl would be "out of pocket" if she spoke to another pimp, criticized defendant, or simply did not earn enough money. There was one instance when defendant threatened to slap Veronica if she acted "out of pocket."

Multiple text exchanges between Veronica and defendant revealed their dealings as "sex worker" and "pimp." In their conversations, they discussed, among other things, confirmation of dates with customers, locations of the dates, transportation to and from the dates by defendant, and the exchange of sex for money. Defendant's phone tracked Veronica's phone so that he knew where she was at all times.

4

Defendant's profile picture for his Instagram social media account was a photo of himself with money. He had conversations with individuals interested in his "girls" through this account. Defendant discussed potential dates as well as set the pricing. Defendant had a video of himself with his chains, one with his name on it, another with Avila's name, and one with a crown. A crown is a symbol human traffickers (or pimps) use to show they are royalty as the head of the household. They also wear the name of their main girl, who is their prized possession. Defendant posted on his social media that he was a pimp and loved his "hoes."

On August 29, 2022, Veronica was arrested for prostitution. When she was arrested, she had a key to defendant's motel room with the room number on it. During the months Veronica worked for defendant, she earned over $10,000. Upon defendant's arrest, police uncovered condoms, a duffle bag containing $40,000 in United States currency, as well as other items, in his vehicle.

Officer Valerie Lancaster, the People's human trafficking expert, testified that a trafficker (or pimp) is at the top of the prostitution hierarchy. The trafficker is typically referred to as "Daddy" to show that he is the head and the girls are under him. The trafficker is in control of everything, including the girls. He controls where they live, what they earn, when they sleep, and when they eat. He also gets all of their earnings, provides protection, and the girls have to ask him permission for everything. She further testified that traffickers use two different tactics, either being very rewarding, giving, and affectionate, or being intimidating and abusive. The primary focus of the human trafficking enterprise is to make money.

## PROCEDURAL BACKGROUND

A jury convicted defendant of human trafficking of a minor (Veronica) for a commercial sex act. (Pen. Code, § 236.1, subd. (c)(1).)[2] Avila was also charged and tried alongside defendant for human trafficking of a minor. The jury found Avila not guilty. The trial court sentenced defendant to eight years in state prison. He was also sentenced to eight months to run consecutively for a previous case where he was convicted of discharging a firearm with gross negligence (§ 246.3, subd. (a)). Defendant timely appealed.

## DISCUSSION

I.    *Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence underlying his human trafficking conviction.[3] He contends that no evidence was presented to the jury that he caused, induced, or persuaded Veronica to engage in commercial sex (§ 236.1, subd. (c)) or that he was a pimp (§ 266h). After reviewing the record in the light most favorable to the judgment, we conclude that the evidence amply supports the conviction.

A. *Standard of Review*

"In assessing the sufficiency of the evidence, we review the entire record to determine whether any rational trier of fact could have found

---

[2]    All further statutory references are to the Penal Code unless otherwise stated.

[3]    Section 236.1, subdivision (c), is part of the Californians Against Sexual Exploitation Act (CASE Act). (*In re Aarica S.* (2014) 223 Cal.App.4th 1480, 1485–1486 [purpose of act to protect persons, particularly children, from all forms of sexual exploitation].)

defendant guilty beyond a reasonable doubt. [Citation.] 'The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] In applying this test, we review the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. [Citation.] The same standard applies where the conviction rests primarily on circumstantial evidence. [Citation.] We may not reweigh the evidence or resolve evidentiary conflicts. [Citation.] The testimony of a single witness can be sufficient to uphold a conviction—even when there is significant countervailing evidence, or the testimony is subject to justifiable suspicion. [Citation.] Accordingly, we may not reverse for insufficient evidence unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support'"" the verdict. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1157–1158.)

B. *Legal Principles*

Section 236.1 provides in relevant part: "(c) A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section . . . 266h [pimping] . . . is guilty of human trafficking."

The court instructed the jury on human trafficking as follows: "To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant caused or induced or persuaded another person to engage in a commercial sex act; [¶] 2. When the defendant acted, he . . . intended to commit a felony violation of Penal Code section 266h, Pimping; [¶] And [¶]

7

3. When the defendant did so, the other person was under 18 years of age. [¶] A *commercial sex act* is sexual conduct that takes place in exchange for anything of value. [¶] When you decide whether the defendant caused or induced or persuaded the other person to engage in a commercial sex act, consider all of the circumstances, including the age of the other person, her relationship to the defendant." (CALCRIM No. 1244.) "The other person's consent is not a defense to this crime." (*Ibid.*) The court also instructed on pimping. (See § 266h, subd. (a) [any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution is guilty of pimping]; see also CALCRIM No. 1150 [pimping].)

### C. *Analysis*

The record is replete with evidence that defendant caused, induced, or persuaded Veronica to engage in a commercial sex act. On appeal, defendant essentially argues that Veronica was a willing participant. This argument is without merit as Veronica's consent is not a defense. (See CALCRIM No. 1244.)

Defendant procured Veronica's employment as a sex worker and provided her with the items and motel rooms necessary to pursue that line of work. Defendant interviewed Veronica to be a sex worker and in exchange for his services as her pimp, he would "take care" of her financially. Veronica testified that she would not have become a sex worker without a pimp. Defendant took Veronica to the "Blade" where commercial sex workers congregated and instructed her on how to attract potential customers and what to charge for her services. Defendant educated Veronica on the practices of a sex worker and took affirmative steps to facilitate her

8

engagement with potential customers. In addition to setting up her own dates, defendant attempted to set up dates for Veronica through his Instagram account. While Veronica was with a customer, defendant supervised her closely and provided her with protection. He also picked Veronica up every weekend and brought her to the Blade. Defendant usually provided Veronica a motel room to stay in as well as another room to have dates with customers. Defendant bought her items to aid her as a sex worker, which included clothing, bags, marijuana, and ecstasy. Defendant refused to let Veronica eat during working hours and she would have to relieve herself on the street. There was sufficient evidence to support the jury's finding that defendant caused, induced, or persuaded Veronica to be a sex worker.

In a similar vein, defendant challenges the sufficiency of the evidence that he was a pimp (§ 266h) because the prosecution failed to prove Veronica was a prostitute. Specifically, that she "engage[d] in sexual intercourse or any lewd act with another person." (CALCRIM No. 1150.) We disagree. Veronica repeatedly testified that she was a sex worker and had sex with her customers. Veronica's repeated reference to "sex" is not only self-explanatory but analogous to the term "sexual intercourse" provided in the jury instructions (CALCRIM No. 1150; see also CALCRIM No. 1244).

In sum, we conclude defendant's conviction of human trafficking of a minor is supported by substantial evidence.

II. *Ineffective Assistance of Counsel*

Defendant contends his trial counsel was ineffective in two ways. First, trial counsel failed to present evidence regarding his mental illness and youth as relevant to the specific intent required to establish human

trafficking.  Second, he contends his counsel failed to timely move to sever his case from his codefendant, Avila.

A. *Legal Principles*

To prevail on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance was deficient and that defendant was prejudiced by the deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  First, to establish deficient performance, a defendant must show that counsel's representation was objectively unreasonable "under prevailing professional norms."  (*Id.* at p. 688.)  Second, a defendant can show prejudice where there is "a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Id.* at p. 694; see also *People v. Goldman* (2014) 225 Cal.App.4th 950, 957.)  Unless defendant establishes otherwise, we presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."  (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

B. *Failure to Present a Defense*

Defendant contends his trial counsel rendered ineffective assistance by failing to present evidence that he lacked the specific intent required for a conviction based on his mental illness and youth.  Defendant was convicted of human trafficking of a minor, which is a specific intent crime.  Among other elements, a conviction for human trafficking requires proof that defendant intended to commit pimping in violation of section 266h.

In support of his argument, defendant relies on statements that were made by trial counsel during a posttrial hearing. Counsel argued for leniency in sentencing as well as orally made a *Romero* motion.[4] In so arguing, counsel addressed defendant's "youthfulness" and "current mental health issues." Counsel noted defendant remained housed in the county jail after trial due to his mental health issues. She represented to the court that defendant "is diagnosed . . . with major depression and bipolar disorder, as well as schizophrenia." Counsel also stated that while in custody, defendant was taking medication (Seroquel, Remeron, and Zoloft) for his psychiatric disorders. Counsel said she had ordered defendant's mental health records. The trial court accepted counsel's representations as to defendant's diagnoses and medications. Counsel clarified to the court that she had no doubt as to defendant's competency.

A defendant is permitted to present "expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent . . . required for conviction of the specific intent crime with which he is charged." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908.) To be relevant, the admitted evidence must concern defendant's condition "at the time of the offense." (*Id*. at p. 909.)

Trial counsel's representations to the court failed to indicate whether defendant suffered from the psychiatric illnesses "at the time of the offense." Rather, it appeared counsel was informing the court of defendant's recent diagnoses and the corresponding medications he was prescribed. Defendant presents no credible argument (aside from a conclusory statement) that trial

---

[4]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

11

counsel was aware of but failed to investigate mental health issues prior to trial. On this record, it is speculative, at best, that defendant suffered from any or all of these mental illnesses at the time of the offense. We do not have a mental health report or similar expert opinion on the matter. Given this record, counsel's performance was not deficient. We also reject defendant's contention that his counsel rendered ineffective assistance by not introducing expert testimony of his youth to aid in his defense. The cases relied on by defendant have no application here as they pertain to punishment of juveniles and corresponding sentencing considerations. (See generally, *Montgomery v. Louisiana* (2016) 577 U.S. 190; *Miller v. Alabama* (2012) 567 U.S. 460; *Roper v. Simmons* (2005) 543 U.S. 551.) None of the cases cited are germane to a defense to a specific intent crime. It is also undisputed defendant was not a juvenile at the time of the commission of the offense. Because we conclude counsel acted reasonably, defendant did not suffer ineffective assistance.

### C. *Failure to Timely Move to Sever*

Lastly, defendant contends trial counsel was ineffective for failing to timely move to sever his case from his codefendant, Avila. We disagree.

During trial, counsel moved to sever based on the possibility of Avila introducing prejudicial evidence against him to aid in her defense, specifically defendant's criminal history. Both the People and Avila opposed the motion. After lengthy argument by the parties, the trial court acknowledged the motion "should have been brought pretrial," but ultimately denied the motion on the merits. The court explained "this case was properly joined to begin with due to it being the same conduct, largely it seems the same evidence, the same class of crimes, indeed the same charge." Also, "there is a legitimate

12

concern in not having . . . the named victim testify twice if there were to be two separate trials," and one trial would serve judicial efficiency. The court also stated it did not believe "there was sufficient basis to grant [severance] even at the outset." Moreover, "divergent defenses tends to clarify the issues for the jurors, not confuse them or obfuscate them." The court did not find any "prejudicial association . . . in trying them together or that the evidence . . . would unfairly inflame or prejudice the jurors against [defendant]." In addition, the court reasoned this was not a case where the evidence against one defendant was being used to bolster a weaker case against the other. Also, there was no bad faith on the prosecutor's part. The court invited defendant or Avila to "renew this motion at a later time in the trial if new issues arise that they might believe warrant reconsideration."

Section 1098 provides: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." "Joint trials are favored because they 'promote economy and efficiency' and "'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.) "When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a 'classic case' for a joint trial." (*Ibid.*)

We decline to decide whether counsel's failure to timely seek severance constituted deficient performance because we conclude there was no likelihood of a different result had counsel done so. As noted, the trial court denied the motion on the merits, not on timeliness grounds. While defendant argues the antagonistic defenses warranted severance, he fails to articulate how an earlier motion to sever would have led to a different outcome. In its

13

ruling, the trial court explicitly stated that it did not believe there was sufficient basis to grant severance prior to trial.

Defendant's reliance on *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790 (*Daveggio*) runs counter to his antagonistic defense argument. In *Daveggio*, our Supreme Court rejected an antagonistic-defense argument similar to the one raised here, in which one codefendant's defense was that her codefendant "controlled her and was the instigator of their joint crimes." (*Daveggio, supra*, 4 Cal.5th at p. 819.) Defendant does not dispute and, in fact, confirms the apparent similarities between the cases. In any event, there was substantial independent evidence against defendant, "dispelling any notion that the conflict alone might have established guilt." (*Id.* at p. 820.) Therefore, we conclude the failure of trial counsel to timely seek severance was not prejudicial to defendant.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ZUKIN, J.

We concur:

COLLINS, Acting P. J.          MORI, J.

14